# UNITED STATES DISTRICT COURT

_____ DISTRICT OF MASSACHUSETTS _____

UNITED STATES OF AMERICA

v.

**Pascual Joseph Guerrier**
a/k/a "Joseph Pascual Guerrier"
a/k/a "Pascual"
(Name of Defendant)

**CRIMINAL COMPLAINT**

Case Number: 2005-M-0437 RBC

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. From on or about **August 3, 2004 through March 9, 2005** in **Essex** County and elsewhere in the District of **Massachusetts**, defendant did, (Track Statutory Language of Offense)

> knowingly and intentionally conspired to possess with intent to distribute heroin, and distributed heroin, a Schedule II Controlled Substance

in violation of Title **21** United States Code, Sections **841(a)(1), 846**.

I further state that I am a(n) **DEA Special Agent**
                                Official Title

and that this complaint is based on the following facts:

> See Affidavit of Special Agent Todd Prough,
> attached hereto and incorporated herein by reference

Continued on the attached sheet and made a part hereof: [x] Yes [ ] No

_____
Special Agent Todd Prough
Drug Enforcement Administration

Sworn to before me and subscribed in my presence,

**March 28, 2005** at 3:40 pm at **Boston, Massachusetts**
Date                                                    City and State

**ROBERT B. COLLINGS**
**United States Magistrate Judge**                      _____
Name and Title of Judicial Officer                      Signature of Judicial Officer

## AFFIDAVIT OF TODD F. PROUGH

I, Todd F. Prough, being duly sworn, depose and state as follows:

### QUALIFICATIONS & INTRODUCTION

1. I am a Special Agent with the Drug Enforcement Administration ("DEA") of the United States Department of Justice, and have been so employed since June, 1997. I am currently assigned to the Boston Field Division of the DEA, and to the Cross Borders Initiative Task Force ("CBI") located in Lowell, Massachusetts.

2. Prior to joining the DEA, I was employed as a detective with the Lycoming County District Attorney's Office in Lycoming County, Pennsylvania, for approximately three years. In that role, I was responsible for investigating significant criminal activity, including homicide, rape, arson and narcotics. For the last eighteen months in that position, I supervised the county-wide drug task force, which was responsible for investigating narcotics trafficking.

3. During my law enforcement career, I have received specialized training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics trafficking activities. Since I have been employed by

1

DEA, I have participated in the execution of numerous search warrants and arrests. I am thus familiar with the operation of illegal drug trafficking organizations, and the methods used to distribute narcotics.

4.  In addition to my training, I have had extensive experience in the investigation of the activities of narcotics traffickers. Since joining the DEA, I have participated in numerous narcotics investigations as a case agent and in a subsidiary role. I have debriefed more than 100 defendants, informants, and witnesses who had personal knowledge about narcotics trafficking activities and the operation of narcotics trafficking organizations. I personally have participated in all aspects of narcotics trafficking investigations, including conducting surveillance, using confidential informants, acting in an undercover capacity, and conducting court-authorized interceptions of wire and electronic communications. During my law enforcement career, I have also participated in the preparation and/or execution of numerous search warrants.

5.  I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

## PURPOSE OF AFFIDAVIT

6. I am submitting this affidavit in support of an application for a criminal complaint charging PASCUAL JOSEPH GUERRIER, a/k/a JOSEPH PASCUAL GUERRIER, a/k/a "PASCUAL" (hereafter, "GUERRIER") with distribution of heroin and conspiracy to possess with intent to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1) and 846.

7. As a result of my personal participation in this investigation, through my conversations with other agents, and my analysis of reports prepared by other agents, I am familiar with all aspects of this investigation. I submit this affidavit based upon my personal knowledge derived from my participation in this investigation and upon information that I have received from a variety of other sources, including other law enforcement officers, public records, telephone toll records, pen register and trap and trace information.

8. This affidavit does not contain all of the information gathered during the investigation; rather it contains information that I believe is sufficient to establish probable cause for the issuance of the requested criminal complaint.

I. **Overview of the Investigation.**

9. This investigation was conducted with the assistance of a cooperating witness ("CW"). During each of the four heroin purchases by CW from GUERRIER described below, CW was acting

under the supervision of, and at the direction of, DEA agents. Before each meeting with GUERRIER, CW and his/her vehicle were checked by DEA agents for contraband or excessive cash, with negative results. CW was equipped with a recorder and/or transmitter prior to each meeting, and all meetings described below were recorded (some were contemporaneously monitored, as well). All of the telephone calls described below were also consensually monitored and/or recorded, except where otherwise noted. The CW was also searched after each transaction, with no unrecovered drugs, excessive cash, or contraband found.

10. During these four meetings, CW purchased a total of approximately 260 grams of heroin from GUERRIER, who often went to meet with people who appeared to be sources of the heroin while the CW was present and waiting to consummate the deal.

II.     **The Investigation.**

    A.     **August 3, 2004: CW purchase of 80.2 grams of heroin from GUERRIER in Lawrence, Massachusetts**

11. On August 2, 2004, a cooperating witness (hereafter, the "CW"), met with GUERRIER, whom DEA had identified through intelligence as a heroin source, in Lawrence, Massachusetts. At the meeting, the CW ordered 100 grams of heroin from GUERRIER. During that meeting, GUERRIER utilized the CW's cellular telephone to call his heroin supplier and arrange the heroin delivery for the following day. After the call, GUERRIER advised the CW that they would be able to complete the transaction the

following day. GUERRIER also informed the CW that the price for 100 grams of heroin was $7,000 ($70 per gram).

12. On August 3, 2004, the CW met with GUERRIER at GUERRIER's residence located at 242 Haverhill Street, apartment #10 in Lawrence, Massachusetts (hereafter, "GUERRIER's residence") to complete the heroin transaction arranged the previous day. During the meeting, GUERRIER placed a telephone call. At the conclusion of the call, GUERRIER told the CW that his supplier had just sold 300 grams of heroin and that the supplier would only be able to deliver 80 grams. The CW agreed to purchase the 80 grams of heroin for $5,600. GUERRIER told the CW that he would call his supplier back and agree to accept delivery of the 80 grams. The CW then departed. The CW remained under DEA surveillance after he/she left GUERRIER's residence. During this time, the CW met with DEA agents and was provided with $5,600 in Official Government Funds.

13. A short while later, still under DEA surveillance and wearing the transmitter/recorder, the CW returned to GUERRIER's residence and met with GUERRIER inside. During the meeting, GUERRIER again placed a phone call. At the end of that call, GUERRIER told the CW that his supplier was on his way and would arrive shortly. The CW then departed after informing GUERRIER that he/she would return shortly. DEA maintained surveillance on both the CW and GUERRIER's residence following the CW's

5

departure.

14. The CW, still under surveillance, returned to GUERRIER's residence a short while later and again met with GUERRIER. Inside, GUERRIER received a call. At the conclusion of the call, GUERRIER told the CW that his supplier had arrived. An unidentified Hispanic male was seen by surveillance agents entering the building. The CW reported that an unidentified Hispanic male then entered GUERRIER's apartment and met with GUERRIER and the CW. The unidentified Hispanic male handed a plastic bag to GUERRIER. The CW then handed GUERRIER the $5,600 in Official Government Funds. GUERRIER then handed the CW the plastic bag he had just been handed. Inside the bag, the CW found eight cylinder-shaped objects wrapped in black electrical tape. The CW then departed and was surveilled by DEA agents to a neutral meeting location. There, the CW handed the plastic bag to DEA agents. The eight cylinder-shaped objects wrapped in black electrical tape inside the plastic bag were later determined to contain a brownish colored, compressed, powdery substance, which, when analyzed by the DEA's Northeast Regional Laboratory, were determined to be 80.2 grams of 13 percent pure heroin.

    B.   **August 20, 2004: CW's purchase of 101.2 grams of heroin from GUERRIER in Lawrence, Massachusetts**

15. On August 18, 2004, the CW placed a telephone call to GUERRIER and asked him about purchasing heroin from him later

6

that week. This call was not consensually monitored or recorded. According to the CW, GUERRIER instructed the CW to meet him at his residence with the money whenever the CW was ready to purchase the heroin.

16. On the morning of August 20, 2004, after meeting with DEA agents and receiving $7,000 in Official Government Funds, the CW met with GUERRIER inside GUERRIER's residence. During the meeting, the CW asked to purchase 100 grams of heroin. Thereafter, GUERRIER placed a series of telephone calls from his home telephone. During one of the calls, the CW heard GUERRIER tell the person he called to "go to the house and wake him up" and that he [GUERRIER] needed "ten." At the conclusion of that call, GUERRIER told the CW that the person he just talked to was going to pick up the heroin and bring it to him [GUERRIER] at his residence. Thereafter, the CW and GUERRIER counted $7,000 in Official Government Funds that had been provided to the CW earlier. Later, surveillance agents saw GUERRIER and the CW exit GUERRIER's residence and wait in the parking lot located behind GUERRIER's residence.

17. Shortly thereafter, surveillance agents observed an Hispanic male arrive driving in a red Kia Sephia (hereafter, the "red Kia"). The red Kia drove into the parking lot behind GUERRIER's residence and parked. GUERRIER then entered the passenger's side of that vehicle. Moments after entering the red

Kia, surveillance agents saw GUERRIER get out of the car carrying a white cordless telephone and another object, and walk towards the CW. Before meeting with the CW, GUERRIER turned around and walked back to the red Kia and re-entered the vehicle. Moments later, GUERRIER again left the car, this time meeting with the CW outside. GUERRIER and the CW then entered GUERRIER's residence where GUERRIER handed the CW a brown paper bag. When GUERRIER handed the CW the brown bag, GUERRIER told the CW that his supplier assured him that the heroin was a better quality than the last time. The CW then handed GUERRIER the $7,000 in Official Government Funds and departed. Under DEA surveillance, the CW proceeded to a neutral meeting location, where he/she handed the brown paper bag and its contents (ten cylinder-shaped objects wrapped in plastic) to a DEA agent.

    18. The ten cylinder-shaped objects purchased by the CW from GUERRIER on August 20th were analyzed by the DEA's Northeast Regional Laboratory and determined to be 101.2 grams of 27 percent pure heroin.

    C. **September 17, 2004: CW's purchase of approximately 29.5 grams of heroin from GUERRIER in Lawrence, Massachusetts**

    19. On September 17, 2004 the CW placed a consensually monitored and recorded call to GUERRIER during which the CW asked if he/she could get "thirty" (meaning 30 grams of heroin). GUERRIER told the CW that he was with his supplier and that he

8

would call the CW back shortly.

20.  A few minutes later, the CW received a call from GUERRIER.  This call was also consensually monitored and recorded.  During the call, GUERRIER told the CW that he could sell the heroin to the CW but that his supplier only had "ten" at the time and that he needed an hour and a half to obtain the other "twenty."  The CW said that he/she would call GUERRIER back soon.

21.  Shortly thereafter, the CW received a call from GUERRIER. This call was also consensually monitored and recorded. During the call, GUERRIER and the CW agreed to meet at Felix Barber Shop (located at 5 Cross Street in Lawrence) in approximately one hour to complete the heroin transaction.

22.  Later, after meeting with DEA agents and receiving $2,100 in Official Government Funds, the CW arrived at Felix Barber Shop and met with GUERRIER inside.  GUERRIER told the CW that he was waiting for his supplier to arrive.  While inside the barber shop waiting for the heroin supplier to arrive, GUERRIER received a call on his cellphone.  At the conclusion of that call, GUERRIER told the CW that the heroin was going to be delivered to them at GUERRIER's residence.

23.  While the CW and GUERRIER were walking to GUERRIER's residence, GUERRIER spoke on the telephone again.  After the call, GUERRIER asked the CW if he/she had the $27,000.  Believing

9

that GUERRIER misunderstood the CW's order of "thirty," the CW explained that he/she only wanted to purchase 30 grams of heroin and that he/she had enough money for that amount only. GUERRIER explained that he and his supplier had interpreted the CW's request for "thirty" as 30 "eggs" of heroin (10 grams of heroin per "egg"). GUERRIER further explained that his supplier had ten "eggs" (100 grams of heroin) and that he was in the process of obtaining an additional 20 "eggs" (200 grams of heroin) because they had thought the CW wanted 300 grams. After a subsequent telephone call by GUERRIER, GUERRIER asked the CW if he/she wanted to purchase the remaining 270 grams of heroin because his supplier did not have anyone else prepared to buy it. The CW informed GUERRIER that he/she did not have enough money at that time to purchase the additional amount of heroin and declined.

24. When the CW and GUERRIER arrived at GUERRIER's residence, the CW and GUERRIER counted the $2,100 in Official Government Funds previously provided to the CW. Shortly thereafter, GUERRIER received a call. After the call, GUERRIER exited the residence. Outside, surveillance agents observed GUERRIER meet with passenger of a vehicle that had arrived in the lot behind GUERRIER's residence moments earlier. Surveillance agents then observed GUERRIER return into his residence. Inside, GUERRIER handed the CW three cylinder-shaped objects consisting of an off-white colored, compressed, powdery substance wrapped in

black electrical tape. The CW handed GUERRIER the $2,100 in return. The CW and GUERRIER then exited the residence. The CW left the area and, under DEA surveillance, proceeded to a neutral meeting location where he/she handed DEA the three cylinder-shaped objects. They were analyzed by the DEA's Northeast Regional Laboratory and determined to be 29.5 grams of 44 percent pure heroin.

      D.    **March 9, 2005: CW's Purchase of approximately 50 grams of heroin from GUERRIER in Lawrence, Massachusetts**

25. On March 9, 2005, the CW contacted GUERRIER by telephone and placed an order for 50 grams of heroin. This call was neither consensually monitored nor recorded. During a previous conversation, GUERRIER told the CW that the price for the heroin was now $75 per gram. GUERRIER told the CW that his supplier would deliver the heroin to him at Felix Barber Shop in 30 minutes. The CW agreed to meet GUERRIER at that location in approximately 30 minutes.

26. Later that day, after meeting with DEA agents and receiving $3,750 in Official Government Funds, the CW arrived at Felix Barber Shop and met with GUERRIER inside. A short while later, after receiving a telephone call, GUERRIER told the CW that he would meet his supplier at his residence. Thereafter, the CW and GUERRIER walked to GUERRIER's residence and entered that location. After a short time, surveillance agents observed

an Hispanic male get out of a taxi and walk into GUERRIER's building. Inside, the CW handed GUERRIER $3,750 in Official Government Funds, which had been provided to the CW before the meeting. Carrying the $3,750, GUERRIER left his apartment. He returned moments later, carrying a plastic bag. GUERRIER handed that bag to the CW. The CW then left and, under surveillance, went to a neutral meeting location. There, the CW provided DEA agents with the plastic bag, which contained five cylinder-shaped objects wrapped in plastic.

27. The five cylinder-shaped objects GUERRIER handed to the CW on March 9th consisted of an off-white colored, compressed, powdery substance that field-tested positive for the presence of heroin. The substance was submitted to the DEA's Northeast Regional Laboratory for analysis. That analysis is pending.

## CONCLUSION.

Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that from on or about August 3, 2004 through March 9, 2005, PASCUAL JOSEPH GUERRIER did intentionally conspire to possess with intent to distribute heroin, and distribute heroin, in violation of

Title 21, United States Code, §§ 841(a)(1) and 846.

_____
Todd F. Prough
Special Agent, DEA


Signed and sworn to before me this 28 day of March 2005.

_____
ROBERT B. COLLINGS
United States Magistrate Judge

✎JS 45  (5/97) - (Revised USAO MA 3/25/02)

| **Criminal Case Cover Sheet** | **U.S. District Court - District of Massachusetts** |

**Place of Offense:**     Category No. __II__     Investigating Agency    __DEA__

City    __Lawrence__            **Related Case Information:**

County  __Essex__            Superseding Ind./ Inf. _____    Case No. _____
                            Same Defendant _____    New Defendant _____
                            Magistrate Judge Case Number _____
                            Search Warrant Case Number _____
                            R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name   __Pascual Joseph Guerrier__          Juvenile   ☐ Yes   ☒ No

Alias Name   __Joseph Pascual Guerrier; Pascual__

Address   __242 Haverhill Street, Apt. 10, Lawrence, MA__

Birth date: __1969__   SS#: _____   Sex: __M__   Race: _____   Nationality: __Spanish__

**Defense Counsel if known:** _____       **Address:** _____

**Bar Number:** _____

**U.S. Attorney Information:**

AUSA   __Rachel E. Hershfang__          Bar Number if applicable _____

Interpreter:   ☒ Yes   ☐ No      List language and/or dialect:   __Spanish__

Matter to be SEALED:   ☒ Yes   ☐ No

☒ Warrant Requested          ☐ Regular Process          ☐ In Custody

**Location Status:**

**Arrest Date:** _____

☐ Already in Federal Custody as _____ in _____.
☐ Already in State Custody _____   ☐ Serving Sentence   ☐ Awaiting Trial
☐ On Pretrial Release:   Ordered by _____ on _____

**Charging Document:**   ☒ Complaint   ☐ Information   ☐ Indictment

**Total # of Counts:**   ☐ Petty _____   ☐ Misdemeanor _____   ☒ Felony __2__

Continue on Page 2 for Entry of U.S.C. Citations

☒    I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are accurately set forth above.

Date: __March 28, 2005__        Signature of AUSA:  _/s/_

JS 45 (5/97) - (Revised USAO MA 3/25/02) Pa____ of 2 or Reverse

**District Court Case Number** (To be filled in by deputy  _____

**Name of Defendant**   Pascual Joseph Guerrier

U.S.C. Citations

| Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|
| Set 1  21 USC § 846 | Conspiracy to Possess With Intent to Distribute Heroin | |
| Set 2  21 USC § 841 | Possession With Intent to Distribute Heroin | |
| Set 3 | | |
| Set 4 | | |
| Set 5 | | |
| Set 6 | | |
| Set 7 | | |
| Set 8 | | |
| Set 9 | | |
| Set | | |
| Set | | |
| Set | | |
| Set | | |
| Set | | |
| Set | | |

**ADDITIONAL INFORMATION:** _____

guerrier js45.wpd - 3/13/02